# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NUMBER:   16-045** |
| **v.** | : | |
| | : | |
| **CARLOS GONZALEZ** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits its sentencing memorandum.   Carlos Gonzalez pleaded guilty on April 10, 2017 pursuant to a Guilt Plea Agreement made under Federal Rule of Criminal Procedure 11(c)(1)(A).   A sentencing hearing is scheduled for July 12, 2017.

## I.   BACKGROUND

### A.   The Charges

February 9, 2016, a grand jury sitting in the Eastern District of Pennsylvania returned a 29-count Indictment charging Carlos Gonzalez with one count of conspiracy to defraud the United States with respect to claims in violation of 18 U.S.C. § 286, fourteen counts of theft of government money in violation of 18 U.S.C. § § 641 and 2, and fourteen counts of aggravated identity theft in violation of 18 U.S.C. § § 1028A(a)(1), (c)(1) and 2.

The Government and the defendant have agreed to a plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, whereby the defendant pleaded guilty to Counts 1, 10, 17, 22, and 28 of the Indictment, and the Government will move to dismiss Counts 2–9, 11–16, 18–21, 23–27, and 29 of the Indictment as to this defendant at the time of sentencing.   Carlos Gonzalez also agreed to make restitution of $2,075,448 as directed

by the Court to the IRS.

**B.     The Offense Conduct**

The charges in this case arise from defendant, Carlos Gonzalez's, participation in a conspiracy to use the stolen identifications of Puerto Rican residents to file false federal income tax returns with the IRS, and collect and cash United States Treasury tax refund checks generated by the false tax returns.   The defendant and his co-conspirators cashed the treasury checks through various check-cashing businesses that they owned or controlled.   The defendant's scheme ran from at least 2010 through at least 2012, and involved over $2 million in fraudulent refund checks.

**Count 1:   Conspiracy to defraud the United States**

Count 1 charges Carlos Gonzalez with conspiracy to defraud the United States with respect to claims, in violation of 18 U.S.C. § 286.   The defendant joined the conspiracy in and around June 2010 when he began operating Emely Multiservice ("Emely"), a check cashing and money service business he owned in Allentown.   The defendant opened his check cashing business to cash the fraudulently obtained tax refund checks made payable to the Puerto Rican residents whose identities had been stolen.   Over ninety percent of the checks the defendant cashed through his Emely business bank account were fraudulently obtained treasury checks.

In order to implement the scheme, the defendant and his co-conspirators prepared the false tax returns in such a way to make it appear that the filer resided at an address where the conspirators could physically access the mail and requested that the IRS send tax refund checks to those addresses.    The defendant recruited father and son Liberado Peralta and Jose Peralta to join the scheme.   The Peraltas provided the defendant addresses where the defendant could

2

have the tax refund checks sent. The defendant paid Liberado and Jose Peralta $500 for each check delivered to their homes.

Between on or about July 27, 2010, and on or about April 15, 2011, the defendant negotiated at least 317 fraudulent tax refund checks with a total value of more than $2 million through Emely (Count 1, Overt Acts 1-317).   After cashing the checks, the defendant kept a portion of the unlawful proceeds and dispersed the remainder among his co-conspirators.

In May 2011, Bank of America became suspicious of the defendant's check cashing business and closed his Emely bank account.   After the bank closed the defendant's business account, the defendant and his co-conspirators submitted to the IRS at least 51 other false claims (overt acts 318-368) totaling at least $305,095.   Because of these false filings, the IRS mailed at least 22 tax refund checks to the addresses that conspirators Liberado Peralta and Jose Peralta supplied to the defendant.   Because he could no longer cash the checks through his own business, the defendant cashed all 22 of the fraudulent refund checks at other check cashing businesses including Discount City, the business operated by his brother Abel Gonzalez, and Almonte Consulting, the business owned by Amauris Almonte.

### Counts 10, 17, 22, and 28:   Theft of Public Money (18 U.S.C. § 641) and Aggravated Identity Theft (18 U.S.C. § 1028A(a)(1), (c)(1))

The following table identifies the dates, initials, and amounts of the refund checks at issue in these specific counts:

| COUNTS | DATE | CASHING LOCATION | PAYEE/ ID THEFT VICTIM | AMOUNT |
|--------|------|------------------|------------------------|--------|
| 10, 17 | March 14, 2012 | Discount City | R.E.V. | $5,795 |
| 22, 28 | November 25, 2011 | Almonte Consulting | M.E.R. | $5,878 |

Co-conspirator Abel Gonzalez operated Discount City, where the fraudulently

3

obtained refund check in Counts 10 and 17 was cashed by Carlos Gonzalez.   Co-conspirator Amauris Almonte owned and operated Almonte Consulting, where the fraudulently obtained refund check in Counts 22 and 28 was cashed by Carlos Gonzalez.

## II.     STATUTORY MAXIMUM AND MANDATORY MINIMUM SENTENCE

The Court may impose the following statutory maximum and mandatory minimum sentences:   **Count 1** (conspiracy to defraud the United States), 10 years' imprisonment, 3 years' supervised release, a $250,000 fine, and a $100 statutory assessment; **Counts 10 and 22** (theft of public money), 10 years' imprisonment, 3 years' supervised release, a $250,000 fine, and a $100 statutory assessment per count; and **Counts 17 and 28** (aggravated identity theft), mandatory 2 years' imprisonment that must be served consecutively to any other sentence other than a different aggravated identity theft sentence, 1 year supervised release, a $250,000 fine, and a $100 statutory assessment per count.

Total Maximum and Mandatory Minimum Sentence is 32 years' imprisonment, 2 years' mandatory minimum imprisonment consecutive to any other sentence other than a different aggravated identity theft sentence, an 11-year period of supervised release, $1,250,000 fine, and a $500 special assessment.   Full restitution of as much as $2,075,488 also may be ordered.   Forfeiture of any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of a violation of 18 U.S.C. § 641 also may be ordered. Defendant may also be deported.

## III.     SENTENCING ANALYSIS

Sentencing involves a three-step process:   "At step one, the court calculates the applicable Guidelines range, which includes the application of any sentencing enhancements[.]

4

At step two, the court considers any motions for departure and, if granted, states how the

departure affects the Guidelines calculation.   At step three, the court considers the recommended

Guidelines range together with the statutory factors listed in 18 U.S.C. § 3553(a) and determines

the appropriate sentence, which may vary upward or downward from the range suggested by the

Guidelines." United States v. Wright, 642 F.3d 148, 152 (3d Cir. 2011) (internal citations

omitted).

### A.   Sentencing Guidelines Calculation

The Presentence Report ("PSR") provided to the Court mistakenly refers to Count

17 as a theft of public money charge instead of the actual charge of aggravated identity theft.

As a result, the government's guidelines calculations are slightly different from those reflected in

the PSR.   The offense was committed from July 27, 2010 through April 12, 2012, and

application of the 2016 Guidelines Manual (effective November 1, 2016) creates no *ex post facto*

issues.   The applicable section is USSG § 2T1.1.

Counts 1, 10, and 22 are grouped as related.   Counts 17 and 28 are treated

separately, as they have a 2-year mandatory minimum sentence of imprisonment consecutive to

any other sentence other than a different aggravated identity theft sentence.   The Base Offense

Level is **22**, which corresponds to the tax loss of $2,075,448, which is between $1,500,000 and

$3,500,000.   USSG § 2T1.4(I).   The defendant has obstructed justice by absconding from

pretrial supervision, which subjects him to an additional 2 points pursuant to §3C1.1.   As a

result, the defendant's Adjusted Offense Level is **24**.   While the defendant has pleaded guilty, he

has absconded and his bail has been revoked, making him ineligible for credit for Acceptance of

Responsibility under USSG § 3E1.1.   A defendant who obstructs justice ordinarily may not

5

claim to have accepted responsibility for his criminal conduct.   United States v. Batista, 483
F.3d 193, 197-99 (3d Cir.2007).   The Total Offense Level for Counts 1, 10, and 22 is therefore
**24**.

   The defendant's Criminal History score is **0**, which places him in Criminal
History **Category I**.   PSR ¶ 49.

   For a Total Offense Level of **24**, the calculated Guidelines imprisonment range is
**51-63 months**.   However, because the statutory penalties for Counts 17 and 28 (Aggravated
Identity Theft, 18 U.S.C. § 1028A(a)(1)), require a 2-year period of mandatory imprisonment
that is consecutive to a term of imprisonment for any other charge other than a different
aggravated identity theft charge, the imprisonment range becomes at least **75-87 months** (with
one consecutive 2 year mandatory minimum sentence) or **99-111 months** (with two consecutive
2-year mandatory minimum sentences).   This falls within Zone D of the Guidelines Table.

   The charges in Counts 1, 10, and 22 (conspiracy, theft of government property)
are Class C felonies under 18 U.S.C. § 3559(a)(4).   The aggravated identity theft charge in
Counts 17 and 28 are Class E felonies.   For purposes of Supervised Release, the Guidelines
recommends at least one year but not more than three years for Class C felonies and one year for
Class E felonies.   USSG § 2D1.2(a)(2).   Because the defendant is a citizen of the Dominican
Republic, he may be deported upon completion of any term of imprisonment.   Supervised
release is not typically ordered, though the Government would request it in this case.   USSG §
5D1.1(c).

   **B.**      **18 U.S.C. § 3553(a) Analysis**

   A thorough consideration of all of the sentencing factors set forth in 18 U.S.C.

§ 3553(a) suggests that the most appropriate sentence in this case is one within the calculated Guidelines range of 75-87 months' imprisonment.   While supervised release is not typically imposed in cases in which the defendant is likely to or may be removed following a term of imprisonment, given his extensive connections to the United States, the government requests a 3-year period of supervised release be imposed.   If the defendant decides to return to the United States following potential removal and does not report to the Probation Office, he will be in violation of Supervised Release conditions, and face further penalty, perhaps deterring him from returning to the United States.

The sentencing factors in 18 U.S.C. § 3553(a)[1]  support a guideline sentence.

1.    **The nature and circumstances of the offense and the history and characteristics of the defendant;**

Carlos Gonzalez came to the United States from the Dominican Republic and proceeded to steal millions of dollars from the United States along with his co-conspirators, some of whom he personally recruited to the conspiracy.   Carlos Gonzalez opened up a check-cashing business in Allentown with the sole purpose of stealing money from the United States using false tax returns, taking advantage of a system in which Puerto Rican residents who work

---

[1]   (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).

only in Puerto Rico are not required to pay the US federal personal income tax, and therefore do not file federal income tax returns.   And along the way he used the stolen identities of hundreds of Puerto Rican residents, such as Ricardo Escobar Vargas, a military veteran, to do it.   Carlos Gonzalez has no regard for this country, its citizens, his family, or this Court.   He stole the money, pleaded guilty and then disappeared.

Carlos Gonzalez not only victimized the United States by stealing millions of dollars from the federal Treasury; he also took advantage of the Pennsylvania state banking system to operate a check-cashing business purely for fraudulent purposes.   In July 2010, Carlos Gonzalez obtained his Emely Multiservice check-cashing license and took advantage of a system in which there were not sufficient resources to audit or monitor check-cashing licensees to detect fraud.   Without legitimate state check-cashing licenses, he would not have been able to hide his check-cashing activity.   And when Bank of America suspected fraudulent activity and closed the Emely Multiservice account, Carlos stopped operating Emely Multiservice, and coordinated cashing checks through other co-conspirators' licensed check-cashing businesses, including those owned by Almonte and Abel Gonzalez.

This case also involves real people whose identities were stolen.   Carlos Gonzalez's scheme worked because there was a market for stolen identities of Puerto Rican residents, and his conduct helped drive that market.   While not considered traditional victims in the sense that money was not stolen directly from them, these hundreds of people may face long-term consequences as a result of having their identities stolen, which has become a hassle of modern life.   These long-term consequences can include issues with credit reporting agencies, flags on IRS tax filings, access to credit, and frustrating paperwork and reporting.   In March

2016, the Federal Trade Commission reported that "Identity theft complaints were the second most reported, increasing more than 47 percent from 2014 on the back of a massive jump in complaints about tax identity theft from consumers."   FTC Annual Summary of Consumer Complaints at https://www.ftc.gov/news-events/press-releases/2016/03/ftc-releases-annual-summary-consumer-complaints.   Carlos Gonzalez and his co-conspirators contributed to this consumer blight.

        2.        **The need to promote respect for the law**;

The integrity of the United States tax system is left vulnerable by thieves like Carlos Gonzalez, and in order to maintain that integrity and promote respect for the law, a lengthy sentence is appropriate in this case.   Like the deterrence factor, a strong and lengthy sentence is necessary to give pause to anyone else like Carlos Gonzalez who attempts to exploit the federal tax system and steal from the US Treasury.

        3.        **The need to provide just punishment for the offense**;

Section 3553(a) requires courts to consider the need to provide just punishment for the offense.   A lengthy sentence is necessary in this case to provide just punishment for the fraud that took place, and the abuse and manipulation of government systems that were used to perpetrate that fraud.   Carlos Gonzalez lied, cheated, and stole more than $2 million from the United States.   Hundreds of stolen identities that belong to Puerto Rican residents were used in the process, without care to the harm that theft may cause.   This crime is more than a crime of lost money from the US Treasury.   It is a direct assault on the integrity of the US tax system, the coordinated tax arrangement with Puerto Rico, and the state banking regulations.   A strong and lengthy sentence is appropriate to reflect the seriousness and widespread harm of this offense.

**4.      The need to afford adequate deterrence to criminal conduct and to <u>protect the public from further crimes of the defendant;</u>**

As discussed above, a lengthy sentence of imprisonment is necessary to deter the

defendant and others who took advantage of the IRS to perpetrate a vast fraud scheme that cost

the US Treasury not only over $2 million in false tax refunds, but also the resources necessary to

detect and identify the cause of the fraud.

**5.      The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most <u>effective manner;</u>**

There is no need in this case to adjust the sentence in order "to provide the

defendant with needed educational or vocational training." <u>Id.</u> § 3553(a)(2)(D).

**6.      <u>The need to provide restitution to any victims of the offense;</u>**

The victim in this case is the IRS.   As part of his plea agreement the defendant

has agreed to restitution to the IRS in the amount of $2,075,488.   The government requests that

the Court order restitution in this amount.

**7.      <u>The need to avoid unwarranted disparities;</u>**

While the sentencing Guidelines are advisory, they remain the sole means

available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional

goal in adopting the Sentencing Reform Act of 1984.   Reference to the Guidelines, while

carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the

only available means of preventing the disfavored result of sentence disparities resulting from

random judicial assignments.   The Third Circuit has explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., the applicable category of offense . . . as set forth in the guidelines.   The section of *Booker* that makes the Guidelines advisory explains that the

remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.* The Guidelines remain at the center of this effort to avoid excessive sentencing disparities, and, as the *Booker* Court explained, "the Sentencing Commission will continue to promote uniformity in the sentencing process" through the Guidelines. We have likewise observed that the Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.

United States v. Ricks, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original, and internal citations and quotations omitted).   Therefore, the Supreme Court has held that "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process" in order to assure fair, proportionate, and uniform sentencing of criminal offenders.   Gall, 128 S. Ct. at 597, n.6.

Moreover, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006); United States v. Carson, 560 F.3d 566, 586 (6th Cir. 2009) ("Although it is true that § 3553(a)(6) requires a sentencing judge to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,'" that "factor 'concerns national disparities between defendants with similar criminal histories convicted of similar criminal conduct – not disparities between codefendants.'").

As explained above, a sentence within the Guideline range will not only provide just punishment, but avoid creating any unwarranted disparity among similarly situated defendants.

## IV.    CONCLUSION

For the above stated reasons the government respectfully submits that a guideline

11

sentence of at least 75-87 months is appropriate in this case.

Respectfully submitted,

LOUIS D. LAPPEN
Acting United States Attorney


 /s Tiwana Wright_____
TIWANA L. WRIGHT
JENNIFER B. JORDAN
Assistant United States Attorneys

DATED:   July 6, 2017

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been served upon the following by electronic filing:

Guy R. Sciolla, Esquire
*guyrsciolla@aol.com*

*Counsel for Carlos Gonzalez*


<u>   /s Tiwana Wright</u>
TIWANA L. WRIGHT
JENNIFER B. JORDAN
Assistant United States Attorneys

Dated:   July 6, 2017